WENDY J. OLSON, IDAHO STATE BAR 7634
UNITED STATES ATTORNEY
RAYMOND E. PATRICCO, DISTRICT OF COLUMBIA BAR NO. 454792
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV, SUITE 600
800 EAST PARK BOULEVARD
BOISE, IDAHO 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1038

U.S. COURTS

APR 1 0 2012

Rcvd_____Filed_____Time_____
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

CR 12-0093-S EJL

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. |
| Plaintiff, | ) |
| | ) **UNDER SEAL** |
| vs. | ) |
| | ) **INDICTMENT** |
| MATTHEW D. HUTCHESON, | ) |
| | ) 18 U.S.C. § 1343 |
| Defendant. | ) 18 U.S.C. § 664 |
| | ) |

The Grand Jury charges:

**GENERAL ALLEGATIONS**

At all times relevant to this indictment:

1.      Title I of the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§§ 1001, *et seq.* (hereinafter "ERISA") established standards governing the operation of most

private-sector employee benefit plans, including pension benefit plans. Pension benefit plans

allowed employees and their employers to make contributions, generally on a tax deferred basis, to the employees' retirement fund.  Generally, under ERISA, pension plan contributions must be held in trust.  When a contribution is made to the plan and placed in trust, the contribution becomes a plan asset.

2.      Under ERISA, a pension plan is governed by a written instrument known as the "plan document."  The plan document describes how and when an employee becomes eligible to participate in the plan, how the plan is to be funded (by employee and/or employer contributions), and the benefits to be provided by the plan.  A plan document also describes the roles and duties of the plan's fiduciaries.

3.      A "plan sponsor" creates a pension plan by adopting a pension plan document and establishing a trust to hold the plan's assets.  The plan sponsor generally has the power to appoint the plan administrator, the plan trustee, and other fiduciaries.

4.      A "plan administrator" is responsible for the day-to-day administration of the plan, including but not limited to, enrollment of new participants, processing distributions to existing participants, and fulfilling the plan's reporting and disclosure requirements.

5.      A plan "record keeper" or "third party administrator" is responsible for assisting the plan administrator in the plan's administration, including the maintaining of financial records and the preparation of participant statements.

6.      An "asset custodian" is responsible for assisting the plan administrator by holding the plan assets.

7.      A plan "trustee" is responsible for safeguarding pension plan assets and ensuring that they are invested prudently and in conformity with the directives of the trust agreement.  The

trustee may delegate responsibility for the selection of specific investments to an investment manager, or may seek advice from an investment advisor.

8. The plan administrator and trustee are "fiduciaries" of the pension plan and its assets.

9. Under ERISA, a fiduciary owes four basic duties to a pension plan and its participants: a duty of loyalty, a duty of prudence, a duty to diversify investments, and a duty to follow the plan document. Specifically, a fiduciary shall "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA.

10. Under ERISA, a fiduciary may not engage in prohibited transactions using plan assets, including self-dealing. Specifically, a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . lending of money or other extension of credit between the plan and a party in interest [any fiduciary]. . . [or] transfer to, or use by or for the benefit of, a party in interest [any fiduciary], of any assets of the plan." Further, under ERISA, a fiduciary "shall not . . . deal with the assets of the plan in his own interest or for his own account."

**Indictment - 3**

11.     The defendant, MATTHEW D. HUTCHESON, was a resident of Eagle, Idaho, and a professional independent fiduciary.  He conducted his fiduciary business principally through Matthew D. Hutcheson, LLC, an Oregon limited liability corporation.  He was also a member of Hutcheson Walker Advisors, LLC (hereinafter "Hutcheson Walker"), a Texas limited liability corporation that served as a plan sponsor and plan administrator.

12.     The G Fiduciary Retirement Income Security Plan (hereinafter the "G Fid Plan") was a pension plan that was subject to the provisions of Title I of ERISA.  G Fiduciary, LLC, a Utah (formerly Oregon) limited liability corporation, was the plan sponsor and plan administrator of the G Fid Plan.  HUTCHESON was a fiduciary and trustee of the G Fid Plan.  Aspire Financial Services, LLC (hereinafter "Aspire Financial"), a Florida limited liability corporation, was the record keeper for the G Fid Plan.  Charles Schwab Trust Company (hereinafter "Charles Schwab") was the asset custodian of the G Fid Plan.

13.     The G Fid Plan document, signed by HUTCHESON as trustee, provided that: "All contributions made to the Plan are made for the exclusive benefit of the Participants and their Beneficiaries, and such contributions shall not be used for, nor diverted to, purposes other than for the exclusive benefit of the Participants and their Beneficiaries (including the costs of maintaining and administering the Plan and corresponding trust)."

14.     In or about July of 2010, the G Fid Plan changed its name to the Benefit Guard 401(k) plan (hereinafter the "Benefit Guard Plan").

15.     The National Retirement Security Plan 401(k) (hereinafter the "NRSP") was a pension plan that was subject to the provisions of Title I of ERISA.  NRSP, LLC, an Idaho limited liability corporation that was owned by HUTCHESON, was the plan sponsor of the NRSP.  Hutcheson Walker was the plan administrator of the NRSP.  HUTCHESON was a

fiduciary and trustee of the NRSP until in or about September of 2011. Trautman Maher and

Associates (hereinafter "Trautman Maher") was the record keeper of the NRSP. TD Ameritrade

Trust Company (hereinafter "TDA") was the asset custodian of the NRSP.

16.     The Retirement Security Plan & Trust (hereinafter the "RSPT") was a pension

plan that was subject to the provisions of Title I of ERISA. Hutcheson Walker was the plan

sponsor and plan administrator of the RSPT. HUTCHESON was a fiduciary and trustee of the

RSPT. Aspire Financial was the record keeper for the RSPT. MG Trust Company (hereinafter

"MG Trust") was the asset custodian of the RSPT.

17.     The RSPT Plan document, signed by HUTCHESON as trustee, provided that:

"All contributions made to the Plan are made for the exclusive benefit of the Participants and

their Beneficiaries, and such contributions shall not be used for, nor diverted to, purposes other

than for the exclusive benefit of the Participants and their Beneficiaries (including the costs of

maintaining and administering the Plan and corresponding trust)." The RSPT Plan document

also provided that: "[t]he trustee shall not engage in any prohibited transaction within the

meaning of the Code and ERISA." Finally, the RSPT Plan document provided that: "[t]he

available investments . . . shall ensure the Plan is sufficiently diversified so as to minimize the

risk of large losses, unless under the circumstances it is clearly prudent not to do so. The Trust

must operate in such a way that market returns are guaranteed (less cost of accounts

maintained)."

18.     The G Fid Plan, the RSPT, and the NRSP are all Multiple Employer Plans

("MEP's"). Unlike single-employer plans or traditional multi-employer plans, MEP's are

intended to serve as a retirement plan that can be adopted by numerous employers

notwithstanding that there is no common ownership or affiliation among the adopting employers.

19.     Green Valley Holdings, LLC (hereinafter "Green Valley Holdings") was a limited liability corporation incorporated in August of 2010 and owned by HUTCHESON. The purpose of Green Valley Holdings was to serve as a vehicle for the purchase the Tamarack Resort, a ski and golf resort near Donnelly, Idaho, that was placed in bankruptcy proceedings in or about December of 2009.

20.     Charles Schwab maintained a bank account containing G Fid plan assets at the Bank of America (bank account number xxxxxxxx-1961).

21.     MG Trust maintained a bank account containing RSPT plan assets at United Western Bank (bank account number xxxxxx-0017).

22.     MG Trust maintained a second bank account containing RSPT plan assets at JP Morgan Chase Bank (bank account number xxxxx-3556).

23.     HUTCHESON maintained a bank account at West Coast Bank in the name of Pension Liquidity Plan & Trust (bank account number xxxxx-5434).

24.     TD Ameritrade maintained a bank account at the First National Bank of Omaha (bank account number xxxx-4641). HUTCHESON wired funds into this account to repay personal loans to two individuals who held accounts at TD Ameritrade.

25.     Green Valley Holdings maintained a bank account at West Coast Bank (bank account number xxxxx-9823).

26.     Amerititle, Inc., maintained a client trust account at U.S. Bank into which escrowed funds were deposited by Green Valley Holdings for the purpose of acquiring the Tamarack Resort (bank account number xxxxxxxx-7086).

27.     Pacific Continental Bank maintained its own bank account at the bank (bank account number xxxx-1593).

Indictment - 6

<u>COUNTS ONE THROUGH TWELVE</u>

**Wire Fraud**
**18 U.S.C. § 1343; 18 U.S.C. § 2**

1.      The allegations set forth in paragraphs One through Twenty-Seven of the General Allegations of this Indictment are hereby realleged and incorporated as though set forth in full herein.

<u>The Scheme</u>

2.      From in or about 2010 to in or about 2011, in the District of Idaho and elsewhere, the defendant,

MATTHEW D. HUTCHESON

did devise and intend to devise a scheme to defraud, as to material matters, the G Fiduciary Retirement Income Security Plan (also known as the Benefit Guard 401(k) Plan) and its participants and beneficiaries, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to misappropriate without authority money and property belonging to the G Fiduciary Retirement Income Security Plan (also known as the Benefit Guard 401(k) Plan) and its participants and beneficiaries.

<u>Manner and Means</u>

It was part of the scheme that:

3.      From January, 2010 through December, 2010, HUTCHESON directed Aspire Financial (the G Fid Plan record keeper) to send twelve wire transfers from the G Fid Plan account at Charles Schwab (containing pension plan assets held in trust for Plan participants and beneficiaries) to accounts controlled by HUTCHESON or for HUTCHESON's personal benefit. In total, the wire transfers amounted to $2,031,688.

**Indictment - 7**

4.     For each of the twelve wire transfers, HUTCHESON instructed Aspire Financial to report on G Fid Plan participant account statements that the money was invested in an investment called "TDA Mid-Term Interest Bearing (Cash Equiv[alent])."

5.     In reality, HUTCHESON did not invest the plan assets, but rather, misappropriated them for his personal use. Typically, the same day he received the plan assets from Charles Schwab, HUTCHESON wired them out to the following vendors and entities, and in the following amounts:

a.     Approximately $892,000 in multiple wire transfers to an Eagle, Idaho, general contractor as payment for extensive renovations and additions to HUTCHESON's personal residence in Eagle, Idaho, including interior remodeling, the construction of a 4,100 square-foot barn (with a loft apartment and office), a swimming pool, hot tub, and pool mechanical building, a secondary garage, a dog house, landscaping and fencing, and driveways.

b.     Approximately $233,000 to a repay a personal loan made to HUTCHESON in December of 2009.

c.     Approximately $133,250 to repay another personal loan made to HUTCHESON in May of 2010.

d.     Approximately $93,000 to a Boise, Idaho, automobile dealership as payment for three automobiles: a 2007 Land Rover sport utility vehicle, a 2004 BMW 3-series convertible, and a 2010 Suburu Outback.

e.     Approximately $15,000 to a Boise, Idaho, motorcycle dealership as partial payment for the purchase of two motorcycles (a 2010 Kawasaki and a 2009 Suzuki) and two 2008 Polaris all-terrain vehicles.

   f.  Approximately $9,000 to a Nampa, Idaho, tractor dealership as payment for a John Deere tractor.

   g.  Approximately $467,000 to Matthew D. Hutcheson, LLC, a portion of which HUTCHESON used for personal expenses.

   h.  Approximately $24,000 to a joint bank account at Wells Fargo Bank in the name of HUTCHESON and his wife, which HUTCHESON and his wife used for personal expenses.

  6.  Beginning in or about March, 2011, to help conceal his misappropriation from the G Fid Plan, HUTCHESON convinced a few employer-clients to "transfer" their pension plan assets from the G Fid Plan to the NRSP.  Because HUTCHESON had already misappropriated approximately $2 million of G Fid Plan assets, there were insufficient funds for the transfers to the NRSP.

  7.  In or about August and September, 2011, after G Fid employer-clients had requested account information verifying the transfer of G Fid balances to the NRSP, HUTCHESON made a number of false and misleading statements to those employer-clients, plan record keepers, and others about the status and location of the pension plan assets.

<u>Wire Communications in Furtherance</u>

On or about the respective dates shown below, in the District of Idaho, the defendant,

MATTHEW D. HUTCHESON

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count of this Indictment:

**Indictment - 9**

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 1 | 1/22/10 | $233,000 wire transfer from Bank of America bank account (ending in #1961) to First National Bank of Omaha bank account (ending in #4641) |
| 2 | 4/30/10 | $160,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 3 | 6/11/10 | $270,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 4 | 7/6/10 | $130,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 5 | 8/16/10 | $220,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 6 | 9/1/10 | $200,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 7 | 9/17/10 | $55,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 8 | 10/18/10 | $200,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 9 | 10/27/10 | $133,250 wire transfer from Bank of America bank account (ending in #1961) to First National Bank of Omaha bank account (ending in #4641) |
| 10 | 11/16/10 | $130,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 11 | 12/6/10 | $275,517 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 12 | 12/23/10 | $24,921 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS THIRTEEN THROUGH TWENTY-FOUR

**Theft from Employee Pension Benefit Plan**
**18 U.S.C. § 664; 18 U.S.C. § 2**

1.      The allegations set forth in Paragraphs One through Twenty-Seven of the General Allegations and Paragraphs Three through Seven of the Manners and Means of Counts One through Twelve of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.      On or about the dates set forth below and in the approximate amounts, each constituting a separate count of this indictment, in the District of Idaho and elsewhere, the defendant,

## MATTHEW D. HUTCHESON,

did embezzle, steal and unlawfully and willfully abstract and convert to his own use the moneys, funds, securities, premiums, credits, property and other assets of the G Fiduciary Retirement Income Security Plan (also known as the Benefit Guard 401(k) Plan), an employee pension benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974 and of a fund connected with such plan.

| COUNT | DATE | DESCRIPTION OF THEFT |
|-------|------|----------------------|
| 13 | 1/22/10 | $233,000 wire transfer from Bank of America bank account (ending in #1961) to First National Bank of Omaha bank account (ending in #4641) |
| 14 | 4/30/10 | $160,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 15 | 6/11/10 | $270,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 16 | 7/6/10 | $130,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 17 | 8/16/10 | $220,000 wire transfer from Bank of America bank account (ending in |

| | | |
|---|---|---|
| | | #1961) to West Coast Bank account (ending in #5434) |
| 18 | 9/1/10 | $200,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 19 | 9/17/10 | $55,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 20 | 10/18/10 | $200,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 21 | 10/27/10 | $133,250 wire transfer from Bank of America bank account (ending in #1961) to First National Bank of Omaha bank account (ending in #4641) |
| 22 | 11/16/10 | $130,000 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 23 | 12/6/10 | $275,517 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |
| 24 | 12/23/10 | $24,921 wire transfer from Bank of America bank account (ending in #1961) to West Coast Bank account (ending in #5434) |

All in violation of Title 18, United States Code, Sections 664 and 2.

## COUNTS TWENTY-FIVE THROUGH TWENTY-NINE

### Wire Fraud
### 18 U.S.C. § 1343; 18 U.S.C. § 2

1.      The allegations set forth in paragraphs One through Twenty-Seven of the General
Allegations of this Indictment are hereby realleged and incorporated as though set forth in full
herein.

### The Scheme

2.      From in or about 2010 to in or about 2011, in the District of Idaho and elsewhere,
the defendant,

### MATTHEW D. HUTCHESON,

did devise and intend to devise a scheme to defraud, as to material matters, the Retirement
Security Plan & Trust and its participants and beneficiaries, and to obtain money and property by
means of materially false and fraudulent pretenses, representations and promises, and to
misappropriate without authority money and property belonging to the Retirement Security Plan
& Trust and its participants and beneficiaries.

### Manner and Means

It was part of the scheme that:

3.      HUTCHESON incorporated Green Valley Holdings and used it to attempt to
acquire the Tamarack Resort.  Initially, HUTCHESON was the sole member.  Later,
HUTCHESON added his wife and business associates as members.  Prior to convening a press
conference to announce that Green Valley Holdings had made a $40 million cash offer to
purchase the Tamarack Resort, HUTCHESON removed himself as a member of Green Valley
Holdings.  After the press conference, HUTCHESON restored himself as a member of Green
Valley Holdings.

Indictment - 13

4.      In an effort to purchase the Tamarack Resort, HUTCHESON (through Green Valley Holdings) prepared false financial documents. Those documents included a fraudulent proof of funds letter purportedly from the President of TD Ameritrade Trust Company. The letter was printed on fraudulent TD Ameritrade Trust Company letterhead and was backdated. The letter falsely stated that TD Ameritrade Trust Company had $40 million in liquid funds and would wire the funds at HUTCHESON's direction. Further, the fraudulent documents included a purported computer "screen shot" of Green Valley Holdings' bank account at West Coast Bank which showed an account balance of over $40 million as of December 30, 2010. In reality, at the time, the balance of Green Valley Holdings' account at West Coast Bank was approximately $55.

5.      HUTCHESON misrepresented the use of the RSPT plan assets to Aspire Financial (the RSPT record keeper) and thereby concealed his actual use of those plan assets from the plan participants. HUTCHESON instructed Aspire Financial to liquidate approximately $3.1 million held by MG trust (the RSPT asset custodian). HUTCHESON explained that the purpose of the liquidation was to purchase, on behalf of RSPT plan participants, a fixed income bank note from Pacific Continental Bank that was secured by an asset in foreclosure purportedly worth $6 million. He described the investment as a short-term transaction with a buy-back to occur in one month or less. HUTCHESON instructed Aspire Financial to describe the investment on RSPT account statements as "Pacific Continental Bank Fixed Income," which Aspire Financial did.

6.      Contrary to his description, HUTCHESON did not invest the plan assets in a short-term, fixed income note in the name of RSPT plan participants. Rather, HUTCHESON used the plan assets to purchase an interest in a golf course and lodge at the Tamarack Resort in the name of Green Valley Holdings. In particular, HUTCHESON, through Green Valley

Indictment - 14

Holdings, entered into a loan sale agreement with Pacific Continental Bank. Pursuant to that agreement, HUTCHESON caused a wire transfer of approximately $3 million of the RSPT plan assets to Pacific Continental Bank in exchange for Green Valley Holdings receiving from the bank a promissory note secured by a majority interest in the Osprey Meadows Golf Course and Lodge at the Tamarack Resort.

7.     After using the RSPT plan assets to purchase the promissory note for Green Valley Holdings, HUTCHESON pledged that same promissory note as collateral for a $425,000 loan for Green Valley Holdings from a private lender in Virginia. The loan agreement placed the private lender in a first lien position to foreclose on the interest in the Osprey Meadows Golf Course and Lodge in the event of default by Green Valley Holdings.

8.     In response to questions from RSPT plan participants and others, HUTCHESON made further misrepresentations. HUTCHESON emailed RSPT plan participants and assured them that he had made a "prudent and loyal" investment in the "Pacific Continental Bank Fixed Income Fund." He explained that a third party was supposed to purchase the investment "from the RSPT trust" soon after, but the sale did not occur. Nonetheless, he assured them that holding the investment for a longer term was "reasonable and understandable" given the long-term horizon of retirement plans. He further stated that, in the meantime, "interest continues to accrue, and will be posted to all RSPT accounts."

9.     HUTCHESON misled the RSPT plan auditor. During the audit, HUTCHESON admitted to the auditor that there was no plan investment in a Pacific Continental Bank note or fund. Rather, he misrepresented to the plan auditor that approximately $3.2 million in RSPT plan assets had been loaned to Green Valley Holdings. HUTCHESON acknowledged to the plan auditor that this was a prohibited transaction under ERISA, but assured the auditor that the loan

was fully secured by the Osprey Meadows Golf Course and Lodge, whose value well exceeded the amount of the loan.  In support of the alleged loan, HUTCHESON provided the auditor with a purported $3.5 million promissory note between the RSPT and Green Valley Holdings, allegedly secured by a "first lien position" on the Osprey Meadows Golf Course and Lodge.  In reality, the loan documents were fraudulent, the signature of the Green Valley Holdings' representative was forged, and the RSPT did not hold a first lien position, or any recorded security interest, in the Osprey Meadows Golf Course and Lodge.

10.     In addition to the approximate $3 million of RSPT plan assets, HUTCHESON diverted additional RSPT plan assets to pursue the purchase of the Tamarack Resort by Green Valley Holdings.  HUTCHESON directed a wire transfer of $275,000 of RSPT plan assets from MG Trust's (the RSPT asset custodian) bank account at United Western Bank to a bank account controlled by HUTCHESON at West Coast Bank.  The same day, HUTCHESON directed a subsequent wire transfer of $250,100 from the account he controlled at West Coast Bank to Green Valley Holdings' bank account at West Coast Bank.  Four days later, HUTCHESON directed a wire transfer of $250,000 from Green Valley Holdings' bank account at West Coast Bank to Amerititle's escrow account at US Bank, to demonstrate to the Tamarack Corporation's creditors that Green Valley Holdings had the financial means to purchase the Tamarack Resort.

<u>Wire Communications in Furtherance</u>

On or about the respective dates shown below, in the District of Idaho, the defendant,

MATTHEW D. HUTCHESON,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count of this Indictment:

**Indictment - 16**

| COUNT | DATE | DESCRIPTION OF WIRE |
|---|---|---|
| 25 | 12/23/10 | $275,000 wire transfer from United Western Bank account (ending in #0017) to West Coast Bank account (ending in #5434) |
| 26 | 12/23/10 | $250,100 wire transfer from West Coast Bank account (ending in #5434) to West Coast Bank account (ending in #9823) |
| 27 | 12/27/10 | $250,000 wire transfer from West Coast Bank account (ending in #9823) to US Bank account (ending in #7086) |
| 28 | 12/27/10 | $3,001,000 wire transfer from JP Morgan Chase Bank account (ending in #3556) to US Bank account (ending in #7086) |
| 29 | 12/27/10 | $2,929,977 wire transfer from US Bank account (ending in #7086) to Pacific Continental Bank account (ending in #1593) |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS THIRTY THROUGH THIRTY-ONE

**Theft from Employee Pension Benefit Plan**
**18 U.S.C. § 664; 18 U.S.C. § 2**

1.      The allegations set forth in Paragraphs One through Twenty-Seven of the General Allegations and Paragraphs Three through Ten of the Manners and Means of Counts Twenty-Five through Twenty-Nine of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.      On or about the dates set forth below and in the approximate amounts, each constituting a separate count of this indictment, in the District of Idaho and elsewhere, the defendant,

MATTHEW D. HUTCHESON,

did embezzle, steal and unlawfully and willfully abstract and convert to his own use the moneys, funds, securities, premiums, credits, property and other assets of the Retirement Security Plan & Trust, an employee pension benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974 and of a fund connected with such plan.

| COUNT | DATE | DESCRIPTION OF THEFT |
|-------|------|----------------------|
| 30 | 12/23/10 | $250,100 wire transfer from West Coast Bank account (ending in #5434) to West Coast Bank account (ending in #9823) |
| 31 | 12/27/10 | $3,001,000 wire transfer from JP Morgan Chase Bank account (ending in #3556) to US Bank account (ending in #7086) |

All in violation of Title 18, United States Code, Sections 664 and 2.

<u>CRIMINAL FORFEITURE ALLEGATIONS</u>

<u>Forfeiture Count One</u>

**Wire Fraud Forfeiture**
**18 U.S.C. §§ 1343, 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461(c)**

As a result of the violations of 18 U.S.C. § 1343,  as charged in the Indictment, the

defendant, MATTHEW D. HUTCHESON, shall forfeit to the United States pursuant to Title 18,

United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code,

Section 2461(c), all property, real and personal, which constitutes or is derived from proceeds

traceable to said violations, including, but not limited to, the following:

<u>MONEY JUDGMENT</u>:

A sum equal to approximately $5,307,688 in United States Currency, representing the

amount of proceeds obtained as a result of the said wire fraud offenses.

<u>SUBSTITUTE ASSETS</u>:

If the above-described forfeitable property, as a result of any act or omission of the

defendant:

        (a)     Cannot be located upon the exercise of due diligence;

        (b)     Has been transferred or sold to, or deposited with, a third party;

        (c)     Has been placed beyond the jurisdiction of the court;

        (d)     Has been substantially diminished in value; or

        (e)     Has been commingled with other property which cannot be divided

                   without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other

property of said defendant up to the value of the forfeitable property described above.

## Forfeiture Count Two

### Employee Pension Benefit Plan Theft Forfeiture

### 18 U.S.C. §§ 664 and 981(a)(1)(C), and 28 U.S.C. § 2461(c)

As a result of the violations of 18 U.S.C. § 664, as charged in the Indictment, the defendant, MATTHEW D. HUTCHESON, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes, or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including, but not limited to the following:

MONEY JUDGMENT:

A sum equal to approximately $5,307,688 in United States Currency, representing the amount of proceeds obtained as a result of the said health care benefit plan theft offense.

SUBSTITUTE ASSETS:

If the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)    Cannot be located upon the exercise of due diligence;

(b)    Has been transferred or sold to, or deposited with, a third party;

(c)    Has been placed beyond the jurisdiction of the court;

(d)    Has been substantially diminished in value; or

(e)    Has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

DATED this ___10th___ day of April, 2012.

A TRUE BILL

/s/ [Signature on Reverse]
Foreperson

WENDY J. OLSON
United States Attorney
By:

Raymond E. Patricco
Assistant United States Attorney

**Indictment - 21**